**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRIAN W., individually and on behalf of N.W., a minor | |
| Plaintiff, | No. 24 CV 2168 |
| v. | Judge Georgia N. Alexakis |
| HEALTH CARE SERVICE CORPORATION, d/b/a BLUE CROSS AND BLUE SHIELD OF TEXAS, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

N.W., a minor, received inpatient treatment for mental health and behavioral issues at Intermountain Children's Home ("Intermountain"), a Montana-based facility that provides such treatment to adolescents. N.W.'s father, Brian, had an employment-based health insurance plan with Health Care Service Corporation, also known as Blue Cross and Blue Shield of Texas ("Blue Cross"). Blue Cross denied N.W.'s claims for payment of medical expenses related to his inpatient treatment. Brian sued Blue Cross on behalf of himself and his son, claiming the denial violated Blue Cross's obligations under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act"). Blue Cross now moves to dismiss W's complaint for failure to state a claim. [10]. For the reasons elaborated below, that motion is denied.

## I.    Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor (as the Court does in the section that follows), but a court need not accept legal conclusions or "threadbare recitals" supported by "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.    Background

N.W. was admitted to inpatient treatment at Intermountain on May 2, 2022, after escalating unsafe behaviors. [1] ¶ 9. Intermountain requested preauthorization for the treatment, which was denied without a written justification. *Id.* ¶ 10. Blue Cross later informed Brian that no payment could be made because "your pre-certification request was not approved," but that "[w]e have asked your health care provider for more information." *Id.* ¶ 11. It added: "We will complete your claim when this information is received." *Id.* The medical expenses related to N.W.'s inpatient treatment exceeded $290,000. *Id.* ¶ 27.

Brian appealed the denial in April 2023, noting that Intermountain had provided the information requested by Blue Cross and invoking ERISA requirements for a full and fair review by appropriately qualified reviewers and for any denials to reference the specific plan provision under which a claim is denied. *Id.* ¶¶ 12–13. Brian specifically informed Blue Cross of his belief that the denial violated the Parity

Act. *Id.* ¶¶ 15–17. Brian also asked that Blue Cross perform a parity compliance analysis on its plan, for physical copies of the result of that analysis, and for all documents related to the plan or N.W.'s treatment. *Id.* ¶¶ 22–23.

In a May 24, 2023 letter, Blue Cross upheld the denial of payment of N.W.'s claims because "the facility [Intermountain] does not meet the Residential Treatment Center (RTC) criteria." *Id.* ¶ 24. Blue Cross continued: "RTC requires the presence of 24-hour nursing and M.D. access." *Id.* Despite Brian's requests, the letter did not indicate which provision of the plan controlled this outcome, i.e., which provision of the plan required that a residential treatment center have 24-hour access to a nurse and doctor. *Id.* Nor did Blue Cross provide the analysis or other plan documents Brian had requested relating to the denial. *Id.* ¶ 25.

Brian sued, claiming that Blue Cross failed to provide coverage for N.W.'s treatment in violation of the plan's terms and that Blue Cross did not meet its obligations under ERISA to provide a "full and fair review" of the claim denial, *see* 29 U.S.C. § 1133(2), or its fiduciary duties, *see id.* § 1104 ("Count I"). [1] ¶¶ 28–35. Brian also alleges that Blue Cross's plan imposed more onerous requirements on residential treatment centers, which provide mental healthcare, than analogous medical or surgical facilities, in violation of the Parity Act ("Count II"). *Id.* ¶ 4.

## III. Analysis

### A. Count I – Denial of Benefits

#### 1. Coverage of N.W.'s Treatment

Brian argues that, under the language of the plan, Blue Cross must cover N.W.'s treatment. The Court applies general principles of contract law to interpret

insurance policies under ERISA and construes any ambiguities in favor of the insured. *See Cheney v. Standard Ins. Co.*, 831 F.3d 445, 450 (7th Cir. 2016). Brian presents two theories for why the plan covers N.W.'s treatment at Intermountain, and the Court address both.

First, Brian argues that Intermountain's requirement that residential treatment centers have 24-hour onsite nursing care violates the Parity Act, and thus cannot bar coverage under the plan. (Brian concedes that Intermountain does not in fact have such care. [1] ¶ 26.) But as discussed later in this opinion, for purposes of Count II, Brian has plausibly alleged that the 24-hour nursing requirement for residential treatment centers violates the Parity Act. *See also R.T. and J.T. v. Blue Cross Blue Shield of Illinois et al.*, No. 23 C 16953, Dkt. 41 at 2 (N.D. Ill. April 16, 2024) (similar plan term plausibly violated Parity Act). In addition, Blue Cross (appropriately) does not argue that a plan provision that would be unlawful under the Parity Act could be used to deny coverage. *See REI Transp., Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 699 (7th Cir. 2008) ("If a provision of a contract violates a statute … that provision is void."). Brian has thus plausibly alleged that Blue Cross should have covered N.W.'s treatment.

In its reply, Blue Cross argues that Intermountain cannot be a residential treatment center, even without the 24-hour nursing requirement, because Brian, in his appeal, submitted Intermountain's youth care facility license rather than a residential treatment center license. [15] at 3. But Blue Cross provides no support for the proposition it intimates: that a facility cannot hold both licenses simultaneously.

4

So the Court has no reason to conclude that the presence of a youth care facility license necessarily demonstrates the absence of a residential treatment center license.

Accepting the complaint's well-pleaded facts as true and making reasonable inferences in Brian's favor, Intermountain is thus a "licensed and accredited provider" of "sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems." [1] ¶¶ 4, 15. In addition, the reason Blue Cross gave for determining that Intermountain "does not meet the Residential Treatment Center (RTC) criteria" of the plan was because those criteria "require[] the presence of 24-hour nursing and M.D. access." *Id.* ¶ 24. Blue Cross did not at the time of the denial mention any deficiency in licensure, which is also a criterion under the plan. [9-1] at 96.[1] Brian has thus adequately alleged that Intermountain is a licensed residential treatment center under Montana law. If Blue Cross has evidence demonstrating that Intermountain is not, that is a factual question that can be disputed at summary judgment.

Brian makes a second argument as well: Even were Intermountain not a residential treatment center under the plan, N.W.'s mental health treatment there should have been covered as an "Eligible Expense" in the "Medical-Surgical Expense" category. [13] at 15. More specifically: The plan states that Medical-Surgical

---

[1] Because the complaint references the plan Blue Cross has attached as an exhibit, and the plan is central to the claims, the Court may consider it at summary judgment. *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). The Court also notes that Brian does not dispute the validity of the document and cites to it in his response. *See, e.g.*, [13] at 6–10. When citing to the plan, the Court cites to the blue ECF numbers at the top of the exhibit.

Expenses "shall include Services of Physicians and Professional Other Providers." [9-1] at 50. A "Professional Other Provider" is defined to include (among other things) "a person or practitioner" who is a Doctor in Psychology, Licensed Clinical Social Worker, or Licensed Professional Counselor. [9-1] at 92–93. In other words, a "Professional Other Provider" includes practitioners who might provide treatment for mental and behavioral health issues like N.W.'s. This is a reasonable inference to draw in Brian's favor in light of the allegation in the complaint stating that W.'s "unsafe behaviors," which prompted his admission to Intermountain, "included verbal and physical aggression, lack of social awareness, age-inappropriate tantrums, biting, head-banging, issues related to autism spectrum disorder, ADHD, and suspected diagnoses of disruptive mood dysregulation disorder and bipolar disorder." [1] ¶ 9.

Next, the plan defines "Mental Health Care" to include both "the diagnosis or treatment of a mental disease, disorder, or condition" listed in certain reference documents or "the diagnosis or treatment of any symptom, condition, disease or disorder by a … Behavioral Health Practitioner or Professional Other Provider" when the expense is for: (a) individual, group, family, or conjoint psychotherapy; (b) counseling; (c) psychoanalysis; (d) psychological testing and assessment; (e) the administration or monitoring of psychotropic drugs, or (f) "[h]ospital visits or consultations in a facility listed in subsection 5." [9-1] at 91. Subsection 5 reads as follows: "Any of the services listed … above, *performed in or by* a Hospital, Facility

Other Provider, or *other licensed facility or unit providing such care*" qualify as Mental Healthcare. *Id.* (emphasis added).

The term "other licensed facility … providing such care" is not defined under the plan. And the complaint does not specifically allege which mental health services N.W. received at Intermountain. But given the allegation regarding N.W.'s mental health needs and the fact that Brian sought assistance for those needs at Intermountain, *see* [1] ¶ 1, and after drawing all reasonable inferences in Brian's favor, the Court concludes that he has adequately alleged that, under the plan, Intermountain is a "licensed facility" that provides "Mental Health Care" and that Brian received such care "in" Intermountain by "Professional Other Providers." *Cf. A.H. by & through G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *3 (W.D. Wash. June 5, 2018) (concluding that plaintiff had plausibly alleged that a treatment provider met "the Plan's generic definition of an 'eligible provider' because it is a state-licensed provider that rendered care to Plaintiff within the scope of its license while Plaintiff attended the program"). Put more succinctly: Brian has adequately alleged that he was wrongfully denied coverage under the plan.[2]

In an attempt to counter the Court's position, Blue Cross argues that none of these treatments at Intermountain are Eligible Expenses because the plan requires

---

[2] Blue Cross argues that Intermountain "does not qualify as a[n] 'other licensed facility,' as that term is used in the Plan" because "'[o]ther licensed [facilities]' must fall under one of the Eligible Expense categories allowed under the Plan." [15] at 4–5 (citing [9-1] at 84, 94). But the plan does not actually say this, and for the reasons already explained, Brian has alleged that Intermountain provides Medical-Surgical Expenses that would qualify as an Eligible Expense.

inpatient mental health care to be provided at a certain type of facility listed in the plan—like a residential treatment center—and Intermountain is not such a facility. [9] at 6 (citing [9-1] at 56, 88). The Court has separately addressed in this opinion why the complaint plausibly alleges Intermountain's status as a residential treatment center. But setting that analysis aside, the plan itself is at the very least ambiguous on the purported requirement Blue Cross asserts. Here is the provision Blue Cross relies on:

> Medically Necessary services for Mental Health Care in a Psychiatric Day Treatment Facility (partial hospitalization program), a Crisis Stabilization Unit or Facility, a Residential Treatment Center for Children and Adolescents, or a Residential Treatment Center in lieu of hospitalization *will be considered Inpatient Hospital Expense*. The Inpatient Hospital Expense benefit percentages for this Plan, and any Deductible as shown on your Schedule of Coverage, will apply.

> The Medical-Surgical Expense benefit percentages for this Plan, and any Deductible as shown on your Schedule of Coverage, will apply.

[9-1] at 56 (emphasis added).

Nothing about this provision requires that inpatient mental health care be provided at one of these types of facilities. Rather, the provision simply tells beneficiaries that treatment provided at such a facility would be considered a particular type of expense ("Inpatient Hospital Expense") for the purpose of billing. In addition, the provision's reference to Medical-Surgical Expenses indicates, for the reasons already discussed, that at least some Mental Health Care falls into that category.

Blue Cross also points to the Schedule of Coverage, which under the heading "Mental Health Care (Including Serious Mental Illness)" includes under the category

8

"Inpatient Services" the following: "Hospital Services (facility)" and "Behavior Health Practitioner services." [15] at 5; [9-1] at 11. According to Blue Cross, this construction excludes "other licensed facility[ies]" from providing inpatient care. [15] at 5. For two reasons, the Court is not persuaded by Blue Cross's reliance on the "Schedule of Coverage."

First, the top of the Schedule of Coverage states: "The following information summarizes the benefits available under the Managed Health Care Benefits section of your coverage." [9-1] at 9. It is not obvious why a summary would override or cabin the definitions provided elsewhere in the plan. Indeed, the schedule's own prefatory language urges plan participants to "carefully read [the] Benefit Booklet" so they "are aware of plan requirements, provisions and limitations and exclusions." *Id.*

Second, the schedule also summarizes coverage for "Medical/Surgical Expenses," a category which, as discussed above, can be defined to include the services of someone like a Doctor in Psychology, Licensed Clinical Social Worker, or Licensed Professional Counselor. [9-1] at 10. According to the schedule, "Medical/Surgical Expenses" includes "inpatient visits." *Id.* That latter term is not defined in the plan, but in moving to dismiss the complaint, Blue Cross gives no indication why the term would not apply to inpatient "Mental Health Care" services that would also qualify as "Medical-Surgical Expenses." In other words, even if the Schedule of Coverage overrode definitions elsewhere in the plan, it is not obvious at this phase—and construing any ambiguities in favor of the insured, *Cheney*, 831 F.3d at 450—why it excludes coverage of N.W.'s treatment at Intermountain.

9

Finally, Blue Cross argues that none of this matters because Intermountain billed its services as residential treatment facility services, thus triggering the plan's 24-hour onsite nursing requirement. [15] at 2. But even if the Court assumed that Blue Cross need not cover Intermountain services billed as residential treatment center services—a live issue, under the Court's analysis—this argument still goes nowhere. Blue Cross supports its billing-based argument with a single statement from Intermountain for services provided from May 2, 2022, through May 14, 2022. [15-1] at 3. The bill totals $7,800—a little less than 3% of the $290,000 in medical expenses alleged in the complaint—so hardly settles the matter of how Blue Cross was billed for the other 97% of N.W.'s expenses. *Id.*; [1] ¶ 27. And, yet again, Blue Cross does not explain why the Court is permitted to consider this sort of extrinsic evidence at this phase. *See Esco*, 107 F.4th at 678.

For all of these reasons, Brian has stated a claim that at least some of N.W.'s treatment should have been covered by Blue Cross under the terms of the plan.

## 2. Procedural Adequacy of the Claim Appeal

ERISA requires "adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). Brian alleges a number of procedural inadequacies: the initial preauthorization was denied without any justification in writing; a later written explanation did not explain why the denial had happened; and Blue Cross upheld the denial of payment on appeal with a brief statement that "RTC requires the presence of 24-hour nursing and M.D. access," but did not address the Parity Act

10

concerns Brian raised, did not state the provisions applied to the denial, and did not include the documents he had requested. [1] ¶¶ 10–25.

In its motion to dismiss, Blue Cross did not dispute that the review procedures as alleged were inadequate, instead arguing that because the plan did not cover Intermountain's services, any procedural inadequacies were irrelevant to Brian's claim. [9] at 6. Blue Cross's reply, however, raises a new argument: that the procedures alleged were, in fact, sufficient under ERISA. [15] at 7–9. In particular, Blue Cross argues that because it provided the "specific reason" for the denial of the appeal—that Intermountain lacked 24-hour onsite nursing care—it had met its obligations and Brian did not properly allege a procedural violation. [15] at 7–9.

But, again, this is a new argument, and one that Blue Cross easily could have made in its initial motion given the substance of the complaint. Because Blue Cross did not, Brian was not able to respond to the arguments in the reply. The Seventh Circuit has instructed that "[t]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited." *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). The Court does so here. Brian has thus stated a claim that Blue Cross's review of his claim denial was procedurally inadequate under ERISA.

### B. Parity Act Violation (Count II)

The Parity Act requires that when a group health plan provides coverage for medical and surgical benefits as well as mental health and substance abuse benefits, the plan must ensure treatment limitations on mental health benefits that are "no

more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(3)(A)(ii).[3]

Brian alleges three facial violations of the Parity Act: (1) the plan imposes unequal requirements for licensure between residential treatment centers, like Intermountain, and analogous medical or surgical care facilities; (2) the plan imposes unequal requirements regarding accreditation as between the two types of entities; and (3) the plan imposes a 24-hour onsite nursing requirement on residential treatment centers but not on analogous treatment facilities for medical or surgical issues. [1] ¶¶ 44–47. Brian further alleges that by imposing the 24-hour onsite nursing requirement, Blue Cross violates the generally accepted standard of care for mental health treatment and its own fiduciary duty to cover services for insured individuals in the most effective and least costly manner that can adequately address the insured's treatment needs, thus contributing to a Parity Act violation. *Id.* ¶¶ 47–54.

Although the Seventh Circuit has not yet addressed the issue, many courts assessing Parity Act violations have adopted the following test: Plaintiffs must show that (1) the relevant group health plan is subject to the Parity Act; (2) the plan provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4)

---

[3] The Parity Act distinguishes between "quantitative" and "nonquantitative" limitations, 29 C.F.R. § 2590.712(a), but the parties agree that the 24-hour onsite nursing requirement is a nonquantitative limitation. [9] at 7; [13] at 6.

the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared. *See A.H.*, No. C17-1889-JCC, 2018 WL 2684387, at *6; *W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1282 (10th Cir. 2023) (collecting cases applying *A.H.* elements); *see also Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 828 (N.D. Ill. 2019) (citing *A.H.*).

Blue Cross does not dispute that the plan is subject to the Parity Act and offers both medical and mental health benefits, thereby satisfying the first two prongs of this test. The parties agree that Skilled Nursing Facilities ("SNFs"), used for medical and surgical benefits, are an appropriate analogue for residential treatment centers, thereby satisfying the fourth prong. [9] to at 7; [13] at 6; *see also V. v. Health Care Serv. Corp.*, No. 15 C 09174, 2016 WL 4765709, at *6 (N.D. Ill. Sept. 13, 2016) ("What's more, the regulations also confirmed that skilled nursing facilities are the medical/surgical 'scope of services' analogue for residential mental health treatment centers."). So the only issue is the third prong: whether the 24-hour onsite nursing requirement that the plan imposes on residential treatment centers is more restrictive than requirements imposed on analogous SNFs.

Blue Cross concedes that, on its face, the plan does not impose a 24-hour nursing requirement on SNFs. [9] at 8. Blue Cross maintains, however, that the plan effectively imposes a similar requirement because "[t]he Plan also requires that SNFs are licensed under state law or are Medicare eligible, which both impose a 24-hour nursing requirement," so the end result is the same. *Id.* But the relevant federal regulations implementing the Parity Act state that "[a] *plan or issuer* may not impose

13

any … treatment limitation that is applicable only with respect to mental health or substance use disorder benefits and not to any medical/surgical benefits in the same benefit classification." 29 C.F.R. § 2590.712(c)(2)(i) (emphasis added). *See also* 29 C.F.R. § 2590.712(c)(4)(i) (barring "*a plan*" from "impos[ing] a … limitation with respect to mental health or substance use disorder benefits in any classification unless, *under the terms of the plan* (or health insurance coverage), *as written* and in operation, any … factors used in designing and applying the … limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the … factors used in designing and applying the limitation with  respect  to medical/surgical  benefits  in  the  classification") (emphases added). Even if all Medicare-eligible SNFs were required by federal regulation to have 24-hour onsite nursing,[4] that is a requirement imposed by federal regulators, not by "a plan or issuer." *Id.* Indeed, reading the plan this way would seem to leave it to susceptible to a potential Parity Act violation any time a government entity altered (e.g., reduced) the regulatory requirements on a SNF.

Blue Cross also has cited to Montana and Illinois laws regulating SNFs to support its position, but Montana's law at least cannot be read as mandating 24-hour

---

[4] For its assertion that all SNFs have 24-hour nursing care, Blue Cross cites to 42 U.S.C. § 1395i-3(b)(4)(C)(i), which states: "*Except as provided in clause (ii)*, a skilled nursing facility must provide 24-hour licensed nursing service which is sufficient to meet nursing needs of its residents" with the nursing needs provided by residents' written plan of care, *id.* § 1395i-3(b)(2) (emphasis added). But clause (ii) allows the United States Department of Health and Human Services to waive the requirement if, among other things, the SNF is in a rural area with an insufficient supply of skilled nursing services and no patients that require the round-the-clock services of a registered professional nurse. *Id.* § 1395i-3(b)(4)(C)(ii). As a general matter, therefore, it is not clear that federal law universally imposes a 24-hour onsite nursing care requirement.

onsite nursing at "substantially all" SNFs, as required under the Parity Act's regulations. The Montana code merely defines "skilled nursing care" as "provision of nursing care services, health-related services, and social services *under the supervision of a licensed registered nurse* on a 24-hour basis" and does not indicate whether the supervision must be onsite or who must provide the care. Mont. Code Ann. § 50-5-101(51) (emphasis added). These ambiguities create a factual question— whether "substantially all" SNFs are required by state law (in Montana, or elsewhere) to have 24-hour onsite nursing—that the Court cannot resolve when addressing a motion to dismiss.

Blue Cross also makes clear in its motion that it considers the plan's 24-hour onsite nursing requirement to be "*in addition to*" other requirements, such as licenses that might be required by state or federal law. [9] at 5 (emphasis in original). Brian is therefore correct that on its face the policy imposes a separate and distinct requirement on residential treatment centers—24-hour onsite nursing care—that it does not impose on SNFs.

Blue Cross also invokes the general standard of care as a defense against Count II. [9] at 11. But the standard of care is generally a factual question appropriate for summary judgment or trial, not a motion to dismiss, and Blue Cross has not offered a reason why that should not be the case in this context. *See, e.g., Horn v. St. Peter's Hosp.*, 406 P.3d 932, 936–37 (Mont. 2017) ("Montana law has long required the presentation of expert testimony to establish the standard of care in a medical negligence case."); *Thompson v. Gordon*, 241 Ill. 2d 428, 445 (2011) ("[I]n professional

negligence cases, the plaintiff bears the burden to establish the standard of care through expert witness testimony."). Nothing in the complaint indicates that a 24-hour nursing requirement is the general standard for residential treatment centers. Blue Cross relies on another exhibit for this point: the guidelines from the American Academy of Child & Adolescent Psychiatry ("the Academy"). [9-3]. Blue Cross asserts that the Academy "sets the generally accepted standards for RTCs for minors." [9] at 11. But Blue Cross again does not explain why the Court can consider this extrinsic evidence, which is not referenced in the complaint, at this phase of litigation. Blue Cross cites to *N.C. v. Premera Blue Cross*, No. 2:21-cv-01257-JHC, 2023 WL 2741874 (W.D. Wash. Mar. 31, 2023), for the proposition that the Court can "consult[] AACAP Principles to define generally accepted standards for RTCs." [9] at 11. And *N.C.* involved a cross-motion for summary judgment, not a motion to dismiss. Even if the Court were to ignore the general standards of care entirely, as Blue Cross invites it to do in its reply, *see* [15] at 14 ("this Court need not address what the generally accepted standards are to dismiss Plaintiff's [Parity Act] count"), dismissal of the complaint would still not be warranted where a facial disparity in the plan persists.

The cases Blue Cross cite for the proposition that the 24-hour onsite nursing requirement does not violate the Parity Act do not avail them in this case. *See* [9] at 9. For example, in *C.B. v. Blue Cross & Blue Shield of Illinois*, No. 23-CV-01206, 2024 WL 1003687 (N.D. Ill. Jan. 9, 2024), the plaintiffs conceded that the requirement was part of the generally accepted standard of care for residential treatment centers and SNFs. *Id.* at *2. Here, Brian argues—and the Court agrees—that Blue Cross cannot

unilaterally establish the standard of care at the motion to dismiss phase. [13] at 24–26. As discussed above, establishing the standard of care would require extrinsic evidence that would not be appropriate for a motion under Rule 12(b)(6).

Other district-court cases upon which Blue Cross relies can similarly be distinguished. *See R.J. v. BlueCross Blueshield of Texas*, No. 23-CV-00177-PAB-STV, 2024 WL 1257524, at *5 (D. Colo. Mar. 25, 2024) ("Although plaintiffs argue that their ERISA claim includes an assertion that the 24-hour onsite nursing requirement violates the Parity Act and cannot be used to deny coverage, the complaint contains no such allegations in relation to plaintiffs' ERISA claim."); *M.P. v. BlueCross BlueShield of Illinois*, No. 2:23-CV-216-TC, 2023 WL 8481410 (D. Utah Dec. 7, 2023) ("Plaintiffs here do not dispute that under the Plan the analogous intermediate levels of care at skilled nursing facilities or inpatient rehabilitation hospitals also include 24-hour nursing requirements."); *J.W. v. Bluecross Blueshield of Texas*, No. 1:21-CV-21, 2022 WL 2905657, at *6 (D. Utah July 22, 2022) (involving a "wilderness program" that was not licensed as a residential treatment center and finding no Parity Act violation "as this provision is applied to Utah facilities.").

Because Brian has plausibly alleged that the plan's 24-hour onsite nursing requirement violates the Parity Act, the Court need not address his other theories of a Parity Act violation as alleged in Count II.

## IV.   Conclusion

For the reasons set forth above, Blue Cross's motion to dismiss [10] is denied.

17

_____
Georgia N. Alexakis
United States District Judge

Date: 1/27/25